UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**UNITED STATES OF AMERICA,**

v.  Case No. 2:15cr64

**MICHAEL LEWIS**

And

**MARIAN LEWIS,**

    **Defendants.**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the court on the government's motion for a finding of criminal contempt and to revoke bond for both defendants. (ECF No. 23). Pursuant to 28 U.S.C. § 636(e)(6)(B), the undersigned held an evidentiary hearing August 27, 2015.[1] Based on the evidence presented at that hearing, the undersigned submits the following proposed findings of facts and recommendation for the disposition of the government's motion pursuant to 28 U.S.C. § 636(b)(1)(B). See F.D.I.C. v. LeGrand,

---

[1] Also at that hearing the undersigned denied the government's motion to revoke the defendants' bond, pursuant to 18 U.S.C. § 3148. The undersigned held that even assuming, without deciding, that the government established probable cause to believe that the defendants committed a federal crime, see § 3148(b)(1)(A), the undersigned did not find that there was no condition or combination of conditions of release that will assure that the defendants will not flee or pose a danger to the safety of any other person or the community, or that the defendants were unlikely to abide by any conditions of release, see § 3149(b)(2). Accordingly, this report addresses only the government's motion for a finding of criminal contempt.

1

43 F.3d 163, 168 (5th Cir. 1995) (holding that magistrate judge may issue a report and recommendation on a motion for contempt). Based on those proposed facts, and consistent with the report's recommendation that the district court not find the defendants guilty of criminal contempt, the undersigned declines to certify the facts to the district judge for contempt proceedings or issue a show cause order because the government failed to meet its burden to prove that the defendants are guilty of criminal contempt. See § 636(e)(6)(B)(ii).

## I. Statement of the Case

On May 20, 2015, a grand jury returned an indictment against Michael Lewis ("Mr. Lewis") and Marian Lewis ("Mrs. Lewis"), charging each defendant with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, and five counts of mail fraud, in violation of 18 U.S.C. § 1341. The government also alleged that if convicted on those charges, the defendants would forfeit proceeds from the acts alleged. See Indictment (ECF No. 2). The allegations in the indictment assert that beginning in November 2009 the defendants defrauded the Village at Woods Edge, a retirement community where Mrs. Lewis worked in Franklin, Virginia, by stealing cash and compromising company credit cards. (ECF No. 2, at 1).

On May 21, 2015, the defendants made their initial appearance before the court. The government agreed to the defendants' release with certain conditions. The Court entered an order setting their conditions of release pending trial. <u>See</u> (ECF Nos. 11, 15).

On May 22, 2015, the court granted the government's sealed motion for a restraining order. <u>See</u> (ECF Nos. 8, 9). As relevant here, the restraining order provides:

> That the defendants, their agents, representatives, servants, employees, attorneys, family members and those persons in active concert or participation with them and **anyone** holding property, both real or personal, for them, is hereby ENJOINED AND RESTRAINED from transferring, selling, assigning, pledging, distributing, giving away, encumbering or otherwise participating in the disposal of (by transfer of stock or otherwise) or removal from the jurisdiction of this Court, or removal from any checking or savings account of all or part of the defendants' interest, in any property, real or personal, up to the sum of not less than **$177,227.00**, without prior approval of the court upon notice to the United States and an opportunity for the United State to be heard, except as specified in this order.
>
> The property subject to this Order includes, but is not limited to the defendants' interest, whether joint or exclusive, in any BANK ACCOUNTS, REAL PROPERTY, CURRENCY, PERSONAL PROPERTY, BUSINESS ENTITIES, MOTOR VEHICLES, BOATS, AIRCRAFT, LIMITED LIABILITY CORPORATIONS, JEWELRY, FURNITURE, ARTWORK, STOCK or FINANCIAL INSTRUMENTS, and specifically includes, but is not limited to, the following:
>
> a. A 2011 Chevrolet HHR with VIN #3GNBAAFW8BS581385.
>
> b. A 2004 Chevrolet truck with VIN #3GNEK12T64G272946.
>
> c. A 2014 Ford Mustang with VIN #1ZVBP8AM7E5314952.

    d. A 2014 Ford Escape with VIN #1FMCU0F77EUB49449.

    e. Real property and improvements located at 28339 Country Club Road in Courtland, Virginia.

    f. Bronco Federal Credit Union account 100160100.

    g. Bronco Federal Credit Union account 10016000.

    h. Bronco Federal Credit Union account 11242000.

    i. Bronco Federal Credit Union account 170873870.

    j. Bronco Federal Credit Union account 12384000.

    k. Bronco Federal Credit Union account 170948740.

    l. Bronco Federal Credit Union account 16033000.

(ECF No. 9, at 1-2) (emphasis in original). Both defendants were arraigned May 27, 2015, where they both entered not guilty pleas. See (ECF Nos. 16, 19). Immediately before arraignment, while both defendants were present with counsel, each was served with a copy of the restraining order.

The government filed its motion for contempt on August 3, 2015. The motion alleged that both defendants willfully violated the terms of the restraining order, and described four specific alleged transfers of property set forth in the order. First, the government claimed that a listed bank account jointly held by Mr. Lewis and his daughter, Rebecca Lewis, was liquidated and the proceeds ($741.75) mailed to Rebecca at "the residence she shares with Marian and Michael Lewis." (ECF No. 23, at 4). Second, a 2007 Nissan automobile, not specifically listed in the

4

order but encompassed by the general description "MOTOR VEHICLES," was allegedly "gifted" to Rebecca by her parents, and retitled in Rebecca's name on June 4, 2015. A second vehicle, the 2011 Chevrolet HHR was alleged to be "missing" and "unaccounted for." Id. at 5, 7. Finally, agents observed that a Carolina Skiff motorboat, which had been located on the property, "was removed" from the property after service of the order.

The defendants filed briefs opposing the Government's motion. (ECF Nos. 25, 26). Separately, they each asserted that Rebecca Lewis was solely responsible for liquidating her account - which contained money she earned. Next they argued that the 2007 Nissan had been purchased by Rebecca using her savings and was retitled only to permit her to obtain car insurance after both parents lost their jobs. Finally they argued that the 2011 HHR had been repossessed and the boat had not been disposed of - only relocated for repairs.

## II. Proposed Findings of Fact

At the hearing on August 27, 2015, the Court received nine exhibits and testimony from four witnesses, including the case agent, Tanya O'Connell, Rebecca Lewis, bank officer Amy Sims, and John Okleshen, a Lewis family friend. This evidence established the following facts.

5

The defendants' daughter, Rebecca Lewis ("Rebecca") was born in 1994. A few days after her birth, the defendants opened a joint savings account with right of survivorship in her name and Mr. Lewis's name with Bronco Federal Credit Union in Franklin, Virginia, with an account number ending in 5000 ("the 5000 account"). See Def. Ex. 3. Over the years, Mr. Lewis would deposit small sums in the account. A statement introduced at the hearing showed monthly $10.00 deposits corresponding to Ms. Lewis' pay periods. As of January 31, 2009, before any of the conduct described in the indictment, the 5000 account had a balance of $8,583.37. Def. Ex. 4.

Beginning at age 14 (2008), Rebecca also worked as a waitress and a babysitter. She deposited her earnings from those jobs, as well as family gifts she received, in both the 5000 account and her student-checking account at Bronco Federal Credit Union, with an account number ending in 8740 ("the 8740 account"). Mrs. Lewis was originally a joint owner of the 8740 account but she was removed in approximately September 2014. Rebecca also had student loans disbursed into the 8740 account. And, the defendants contributed occasional deposits to 8740 account, which Rebecca used while attending college.

On June 17, 2010, Mr. Lewis sent a wire transfer of $7,000.00 from the 5000 account to E. Darlene Hughes, Rebecca's aunt. Def. Ex. 5. That transfer, a substantial portion of

which was earned by Rebecca from her jobs, was for the purchase of a 2007 Nissan Versa for Rebecca to drive once licensed. Rebecca has since driven the Nissan Versa, and has been the only person in the Lewis family to drive the Nissan Versa on a regular basis. She presently uses the vehicle while attending college in Farmville, Virginia.

In April 2014, law enforcement officers executed a search warrant at the defendants' house in Courtland, Virginia. Agent O'Connell testified that law enforcement searched for evidence of the crimes alleged in the indictment in this court, much of which was home improvement personal property or fixtures, traced to the allegedly fraudulent company credit card transactions at Lowes and Walmart. The government introduced photos taken during the execution of that warrant. See Gov't Ex. 1.

Those photos appear to show present on the defendants' property, among other things: a Jeep Grand Cherokee, a Ford Escape, a Mercury Mountaineer, a Chevrolet Avalanche, an above-ground swimming pool, a gas grill, a Carolina Skiff motorboat on a trailer, a small aluminum boat with no motor, two four-wheel ATV's, a riding lawn mower, and other landscaping equipment, as well as the defendants' house and a multiple-car detached garage. Id. Around the time of the search warrant, law enforcement also subpoenaed the records of Bronco Federal Credit Union in Franklin, Virginia.

The court issued the restraining order on May 22, 2015. (ECF No. 9). Tonya O'Connell, an agent with the United States Secret Service, personally served both defendants with the court's restraining order, in the presence of their attorneys, just before their 9:00 AM arraignments on the morning of May 27, 2015. The Lewis's children were never served with the restraining order.

Also on May 27, 2015, at approximately 11:40 AM, Rebecca made a phone call to Bronco Federal Credit Union from her student teaching practicum in Mechanicsville, Virginia.[2] Calling into an automated bank service, protected by account owner identity verification, Rebecca requested two transactions. She directed Bronco to transfer $503.46 (all of the funds in the 8740 account) from the 8740 account to the 5000 account. At the time, the 8740 account was titled exclusively in Rebecca's name. The 5000 account was titled jointly with her father, Michael Lewis. Rebecca withdrew all but the minimum required balance of $5.00 from the 5000 account. Bronco mailed a cashier's check made payable to Rebecca Lewis for that withdrawal amount, $741.75, to her parents' house in Courtland. See Gov. Ex. 6. The envelope in which Bronco mailed the check was addressed to

---

[2] Rebecca is a special education major at Longwood University in Farmville, Virginia.

8

Michael and Rebecca Lewis - the joint owners of the 5000 account, but the enclosed check was payable to Rebecca alone.

At approximately 2:00 PM on May 27, 2015, Bronco Federal Credit Union was served with the restraining order. Amy Simms, Bronco Federal Credit Union Compliance and Auditing Coordinator, called law enforcement to report the activity on the 7840 account and the 5000 account. Rebecca's parents did not tell her to move the money from those accounts. She testified she did not know why she called that day, but she was planning on opening an account with a bank in Farmville, so that she would not have to return to Courtland or Franklin to cash checks at Bronco. Rebecca has since opened an account with Citizens Bank in Farmville.

Sometime after her parents were indicted, they told Rebecca that the Nissan Versa was no longer insured and that in order to drive it, she needed to obtain car insurance. Rebecca went in person to a State Farm office to inquire about insurance for the Nissan. The State Farm agent informed Rebecca that under Virginia law, Rebecca needed to have the car titled in her name in order to establish that she had an insurable interest in it. Rebecca went home and told her parents.

On June 4, 2015, the defendants transferred title of the Nissan to Rebecca and recorded it with Virginia DMV. Under "sale price" they listed "gift from parents." Gov. Ex. 4.

9

Because the Nissan was not physically present when agents searched the Lewis property, it was not specifically listed on the restraining order, but Agent O'Connell discovered the transfer when investigating another vehicle removed from the property.

On June 5, 2015, law enforcement observed that the Carolina Skiff listed in the restraining order, and titled to Mr. Lewis, was "removed" from the property. Sometime during the summer, Mr. Lewis had taken to the boat to his friend, John Okleshen's house for repairs. Mr. Okleshen, who works as a ship fitter at Norfolk Naval Shipyard, testified that he occasionally helps out his friends, the defendants, in exchange for dinner or the like. Mr. Okleshen testified that he was going to attempt to work on Mr. Lewis's motor's carburetor in his spare time because the motor had been idling strangely, but Mr. Lewis was in no hurry to have it fixed.

On July 30, 2015, Agent O'Connell and other law enforcement traveled to the Lewises' house in Courtland to search for property subject to the restraining order, pursuant to a writ of entry. Mrs. Lewis met law enforcement at the home and consented to a search of the property. Law enforcement took photographs of the property and reported that the Carolina Skiff was not present, nor the ATVs or the "2014 cars," which were both titled to the Lewises' other daughter, Vivian Michelle Lewis. See Gov't

Ex. 5. Mr. Lewis also arrived at the house while agents were there. Mr. Lewis did not object, but was frustrated with the agents' presence. He remarked that they "got everything they were going to get" during the execution of the search warrant.

In addition to the missing boat, the Chevrolet HHR listed in the restraining order was found to have been removed from the property. The evidence established that the HHR had been repossessed by the lender on June 30, 2015, when the defendants were unable to make payments.

On August 3, 2015, the government filed its motion for contempt and bond revocation. Sometime thereafter, but prior to the August 27, 2015 hearing, Mr. Lewis informed Mr. Okleshen that there was an issue with the boat being off Mr. Lewis' property, and Mr. Lewis said he was going to pick it up. Mr. Lewis retuned the Carolina Skiff to his house in Courtland, as confirmed by law enforcement, without any work being done on its motor.

### III. Discussion

The government has alleged that the defendants are guilty of criminal contempt under 18 U.S.C. § 401(3). 28 U.S.C. § 636(e) governs the procedure for criminal contempt that occurs outside the presence of a magistrate judge. It provides that "upon the commission of any such act" constituting criminal contempt, where the act that constitutes a criminal contempt occurs

11

outside the presence of the magistrate judge, . . . the magistrate judge shall forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified. The district judge shall thereupon hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge.

§ 636(e)(6). This procedure "provides [the person alleged to be in contempt] with an opportunity to explain his conduct to the Magistrate prior to the matter being certified for a full-blown contempt trial." In re Kitterman, 696 F. Supp. 1366, 1370 (D. Nev. 1988); see also Fed. R. Crim. P. 42. And, "[i]f the Magistrate finds [the] explanation to be satisfactory, she may choose not to certify the matter for further proceedings." In re Kitterman, 696 F. Supp. At 1370. Accordingly, as a necessary predicate to certifying facts to the district judge for criminal contempt proceedings, there must be evidence of criminal contempt.

"One may be found in contempt under § 401(3) only if []he '<u>willfully</u> violated a decree that was clear and left no uncertainty in the minds of those that heard it.'" <u>United States v. Westbrooks</u>, 780 F.3d 593, 595 (4th Cir. 2015) (quoting <u>In re Gates</u>, 600 F.3d 333, 338 (4th Cir. 2010) (emphasis in original)). Thus, the government here must show: "1) a reasonably specific order, 2) violation of the order, and 3) the willful intent to violate the order." <u>United States v. Allen</u>, 587 F.3d 246, 255 (5th Cir. 2009). As the government conceded during oral argument, criminal contempt carries a specific intent element.

While conceding that several of the suspected "transfers" of property turned out to be benign, the government nonetheless argued that the defendants were "playing games" with the government and the court, and that their actions involving property described in the order did, in the aggregate, constitute a willful violation. However, with the exception of the case agent, no witness called by the government supported its claims, and the government did not carry its burden to make a showing of the elements of criminal contempt.

The government's evidence proved the defendants were involved in only one of four specifically alleged violations of the restraining order - the assignment of the Nissan Versa to Rebecca. With respect to the other three - Rebecca's Bronco

13

accounts, the Carolina Skiff boat, and the 2011 HHR, the uncontroverted evidence is that neither defendant violated the terms of the order, much less willfully did so.

Again the restraining order provides:

> That the defendants, their . . . family members and those persons in active concert or participation with them . . . is hereby ENJOINED AND RESTRAINED from transferring, selling, assigning, pledging, distributing, <u>giving away</u>, encumbering . . . or removal from any checking or savings account of <u>all or part of the defendants' interest</u>, in any property, real or personal, up to the sum of not less than $177,227.00, without prior approval of the court upon notice to the United States . . . .

(ECF No. 9, at 1-2) (emphasis added). The restraining order's list of property was a non-exhaustive list, and followed the general property descriptions "MOTOR VEHICLES" and "BOATS." <u>See</u> <u>id.</u> at 2.

First, the government's evidence fails to show any violation of the court's order with regard to Rebecca's accounts. The testimony presented at the August 27, 2015 hearing established that Rebecca, and only Rebecca, called Bronco Federal Credit Union and consolidated her individually titled 8740 account and the joint 5000 account. The evidence also confirmed the cashier's check issued on May 27, 2015 was payable exclusively to Rebecca. The restraining order prohibits the defendants' family members from "remov[ing] from any checking or savings account of all or part of the defendants'

14

interest." (ECF No. 9, at 2). But neither the Bank nor Rebecca had notice of the Order when the transfers were made. As a joint owner of the 5000 account, Mr. Lewis had a legal interest in the account. However, because Rebecca was the sole actor to cause transfers, the government cannot show that the defendants - who are the ones who allegedly committed contempt - willfully violated the restraining order. Despite the suspicious timing of the transfers, there was no direct evidence that the defendants had any involvement with the account transfers on May 27, 2015. In fact, the bank officer testified that only Rebecca - or someone with her unique password - could have effected the closure of her checking account. As a result, the government produced no evidence of defendants' criminal contempt with regard to Rebecca's accounts.

Likewise, the government proved neither a violation nor willfulness with respect to the Carolina Skiff boat. Mr. Lewis dropped off the boat at Mr. Okleshen's house in Courtland for non-urgent repairs to the motor. Mr. Lewis did not transfer, sell, assign, pledge, distribute, give away, encumber or otherwise dispose of or remove from the jurisdiction of this court, the Carolina Skiff. See Restraining Order (ECF No. 9, at 2). Without evidence that the defendants were guilty of such conduct, there was no violation of the restraining order. Consequently, the government could not prove criminal contempt

by disobedience or resistance to a lawful order. See 18 U.S.C. § 401(3).

Finally, as the government appeared to concede, the title transfer of the 2011 HHR came as a result of its repossession by a secured lender for non-payment. While the government complains that the lender acted remarkably swiftly after entry of the Order, it did not dispute the defendants' suggestion that they could no longer afford the payments. Nor did it serve the lender with a copy of the Order. In addition, the fact of the repossession was independently confirmed by the secured lender.[3]

The 2007 Nissan driven by Rebecca Lewis was titled to both defendants. Although the Nissan was purchased with Rebecca's money, the Virginia certificate of title is prima facie evidence of an ownership interest in the car. See Buckeye Union Cas. Co. v. Robertson, 147 S.E.2d 94, 97 (Va. 1966)("[A]nd that the presumption of ownership evidenced by the certificate of title may be overcome by evidence that the true owner of the vehicle is a person other than the one in whose name the vehicle is registered."). Accord Keyes v. Keyes, 392 S.E.2d 693, 695 (W. Va. 1990). In addition, the title documents recited that the transfer on June 5 was a "gift from parents." Accordingly, at least from the title documents alone, it would appear that the

---

[3] Though it is not necessary to the court's finding, the Lewises' counsel proffered that the Lewises owed significantly more than the vehicle was worth.

16

defendants "gave away" their interest in the Nissan Versa. That is a violation of the restraining order by its terms.

Notwithstanding a likely violation of the restraining order however, the government failed to show that the defendants acted willfully. That is, there was insufficient evidence for the undersigned to conclude that the defendants specifically intended to violate the restraining order when they transferred the title to Rebecca or knew that such a transfer violated the restraining order. See, e.g., Bryan v. United States, 524 U.S. 184, 192 (1998) ("[T]he Government must prove that the defendant acted with knowledge that his conduct was unlawful.")(citing Ratzlaf v. United States, 510 U.S. 135, 137 (1994)). Both Rebecca and John Okleshen testified that Rebecca purchased the vehicle with money she had saved. This testimony was corroborated by bank records showing that Rebecca had accumulated sufficient funds to buy the car before any of the wrongdoing alleged against her parents occurred. Finally, the records establish that the funds used to purchase the vehicle came from Rebecca's account.

Under these circumstances, the defendants' actions do not appear intentionally calculated to violate the court's order. Instead, they are intended to reflect, for insurance purposes, the reality that the Nissan Versa was Rebecca's car, purchased with her own money, which she accumulated before her parents are

even alleged to have engaged in wrongdoing. Moreover, the Nissan was not specifically listed on the restraining order despite the fact that two other vehicles, not titled in the defendants' names, were listed. Thus, the defendants' mistaken interpretation of the restraining order cannot be construed as a willful violation. As a result, the government did not establish evidence of criminal contempt sufficient to warrant certifying the facts for prosecution of criminal contempt to the district judge.

### IV. Recommendation

Based on the foregoing, the undersigned RECOMMENDS that the court DENY the government's motion for contempt. (ECF No. 23).

### V. Review Procedure

To the extent not inconsistent with 28 U.S.C. § 636(e), by copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/ *[signature]*
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

September 3, 2015